**William and Harris GARRETT, etc.,**
**Plaintiff-Appellant,**

v.

**UNITED STATES of America,**
**Defendant-Appellee.**

**Laura Jane GARRETT et al.,**
**Plaintiffs-Appellants,**

v.

**UNITED STATES of America,**
**Defendant-Appellee.**

**No. 72–3397**
**Summary Calendar.***

United States Court of Appeals,
Fifth Circuit.
May 23, 1973.

---

* Rule 18, 5th Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New

York et al., 5th Cir. 1970, 431 F.2d 409, Part I.

Walter W. Brudno, Dallas, Tex., for plaintiffs-appellants.

Frank D. McCown, U. S. Atty., Martha Joe Stroud, Asst. U. S. Atty., Dallas, Tex., Ben A. Douglas, Atty., Tax Div., Dept. of Justice, Dallas, Tex., Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Atty., Tax Div., Dept. of Justice, Washington, D. C., Eldon B. Mahon, U. S. Atty., Fort Worth, Tex., for defendant-appellee.

Before THORNBERRY, GOLDBERG and RONEY, Circuit Judges.

RONEY, Circuit Judge:

This tax refund suit presents a question of first impression concerning the statutory exemption from the Interest Equalization Tax, 26 U.S.C.A. §§ 4911 4915. This tax seeks to restrict the outflow of investment capital abroad by imposing a special tax on certain purchases of foreign securities. The taxpayers contend that their acquisitions of foreign stock are statutorily exempt from the tax. The District Court held that an exception to the exemption defeats the taxpayers. We affirm.

## THE TAX

The Interest Equalization Tax, 26 U.S.C.A. § 4911, imposes an additional tax burden on investments in stock and long-term obligations of foreign issuers and thereby tends to equalize the

yield of foreign and domestic issues.[1] In this way, Congress purported to reduce the attractiveness of high-yield foreign securities to American capital: "These tax rates are designed to reduce the net rate of return to the U.S. buyer on the foreign securities involved . . . in order to decrease the volume of foreign securities sold in the U. S. market." H.R.Rep. No. 1046, 88th Cong., 1st Sess., 2 (1964) (1964—2 Cum.Bull. 708).

There is no dispute that the taxpayers acquired stock in a foreign issuer that would be subject to the tax, unless exempted by specific provisions of the statute.

## THE EXEMPTION

Section 4915 exempts from this tax certain so-called "direct investments" where the taxpayer acquires ten percent or more of the outstanding stock of the issuer.[2] The apparent justification for this exemption is that investment decisions of this business nature are generally concerned with market position and long-range profitability rather than interest-rate differentials. Congress did not deem it appropriate to apply to these transactions the tax which

is intended to equalize costs as between capital markets. H.R.Rep. No. 1046, *supra,* at 15–16 (1964—2 Cum.Bull. 708, 718); S.Rep. No. 1267, 88th Cong., 2d Sess. 15–16 (1964), U.S.Code Cong. & Admin.News, p. 3478. (1964—2 Cum. Bull. 778). Thus, the purpose of the Interest Equalization Tax is to restrict the outflow of American capital only when it is occasioned by a search for higher foreign interest rates, not when the motivation is longer range business or investment considerations.

The Government concedes that the taxpayers acquired more than ten percent of the stock of the issuer so that the tax does not apply unless an exception written into the exemption provisions denies taxpayers the benefit of the exemption.

## THE EXCEPTION TO THE EXEMPTION

The exception, briefly, is this: even when ten percent or more of an issuer's stock has been acquired, the Section 4915 exemption is inapplicable if the foreign corporation has been "formed or availed of" for the principal purpose of acquiring through such corporation an interest in stock, the direct acquisition

---

1. § 4911. Imposition of tax
    (a) In general.—There is hereby imposed, on each acquisition by a United States person (as defined in section 4920(a)(4) of stock of a foreign issuer, or of a debt obligation of a foreign obligor (if such obligation has a period remaining to maturity of 1 year or more), a tax determined under subsection (b).

2. § 4915. Exclusion for direct investments
    (a) In general.—
    (1) Excluded acquisitions.—Except as provided in subsections (c) and (d) of this section, the tax imposed by section 4911 shall not apply to the acquisition by a United States person (A) of stock or a debt obligation of a foreign corporation, or of a debt obligation from a foreign corporation which received such obligation in the ordinary course of its trade or business as a result of the sale or rental of products manufactured or assembled by it or of

the performance of services by it, if immediately after the acquisition such person (or one or more includible corporations in an affiliated group, as defined in section 1504, of which such person is a member) owns (directly or indirectly) 10 percent or more of the total combined voting power of all classes of stock of such foreign corporation, or (B) of stock or a debt obligation of a foreign partnership if immediately after the acquisition such person owns (directly or indirectly) 10 percent or more of the profits interest in such foreign partnership. For purposes of the preceding sentence, stock owned (directly or indirectly) by or for a foreign corporation shall be considered as being owned proportionately by its shareholders, and stock owned (directly or indirectly) by or for a foreign partnership shall be considered as being owned proportionately by its partners.

of which would be subject to the Interest Equalization Tax.[3]

Although taxpayers acquired more than ten percent of the stock of a foreign corporation, it appeared that the sole asset of the corporation was less than ten percent of the stock of another foreign corporation, the direct acquisition of which would have been subject to the tax.

## THE QUESTION

■ The question in this case is whether the taxpayers "availed of" the foreign corporation for the principal purpose of acquiring an interest in stock that would ordinarily be subject to the tax. The District Court held that, in the taxpayers' purchase of stock of the foreign issuer, the issuing corporation had been "availed of," within the meaning of the Act, for the principal purpose of acquiring through it an interest in its foreign stock assets, the direct acquisition of which would be subject to the tax. We agree.

## THE FACTS

Taxpayers purchased 20,750 shares of Westsales, a Luxembourg corporation that had 90,000 shares of common stock outstanding. Westsales' sole asset was 90,000 shares of common stock of Western Sales, Ltd., a Bahamian corporation, out of a total of 1,947,000 outstanding shares of stock. Although the taxpayers' acquisitions involved well over ten percent of Westsales stock, the equivalent interest taxpayers obtained on a share-for-share basis in Western stock was less than one percent.

As of the date of purchase, an active market for Western's stock did exist in the United States, but no active market existed anywhere for Westsales stock. William Garrett testified that his reasons for purchasing Westsales stock were (1) that the earnings of Westsales had a favorable ratio, (2) that the underlying book value of Westsales assets (Western stock) was favorable when compared with the purchase price, and (3) that the differential between the sales price of Western stock in the United States (approximately $7.50–$8.00 per share) and the sales price at which he could purchase Westsales ($4.50 per share) was favorable. Since Westsales' only asset consisted of Western stock, Mr. Garrett, in purchasing Westsales stock, was considering the advantages to be derived from the *pro rata* share of Western which would be owned. Westsales had been formed in 1965, when Western stock was distributed as a dividend to the shareholders of Western's parent company, for the purpose of avoiding certain foreign exchange restrictions imposed on residents of pound sterling areas. Westsales issued to residents of sterling areas one share of its common stock for each share of Western stock to which they would have been entitled.

Whether under these circumstances the ten percent rule exempts taxpayers' acquisition or the statutory exception bars the exemption is the question for determination. The decision turns on whether the foreign corporation was, within Congressional intent, "availed of" by the taxpayers to acquire an interest in stock, the direct acquisition of which would be subject to the tax.

## THE DECISION

■ The taxpayers argue that the District Court erred in holding that, in their purchase of Westsales' stock,

3. § 4915.
   (c) Exception for foreign corporations or partnerships formed or availed of for tax avoidance.—
   (1) In general.—The provisions of subsections (a) and (b) shall be inapplicable in any case where the foreign corporation or foreign partnership is formed or availed of by the United States person for the principal purpose of acquiring, through such corporation or partnership, an interest in stock or debt obligations (of one or more other foreign issuers or obligors) the direct acquisition of which by the United States person would be subject to the tax imposed by section 4911.

"Westsales was availed of by American citizens for the principal purpose of acquiring, through such corporation, an interest in stock the direct acquisition of which by plaintiffs, American citizens, would be subject to the Interest Equalization Tax." Taxpayers' contention that they did not "avail of" Westsales within the statute's meaning rests on the premise that the statutory language refers solely to the corporation's activities *after* a taxpayer's acquisition of ten percent interest. They point to legislative history which suggests, they contend, that the words "formed" and "availed of" modify each other:

> U. S. persons will not be allowed to form "closely held" holding companies for the purpose of acquiring securities which would be taxed if acquired directly.

2 U.S.Code Cong. & Admin.News, pp. 3478, 3493 (1964) (S.Rep. No. 1267, *supra*). Since Westsales made no acquisition of Western or any other company after the taxpayers' purchase, taxpayers reason that they did not "avail of" the corporation.

But taxpayers overlook the context and purpose of this statement. The preceding sentence in that Senate Report provides that

> [t]he "direct investment" exception is not to apply if the foreign corporation or partnership is formed or availed of for the principal purpose of acquiring stock or debt obligations of foreign issuers or obligors in a case where the 10-percent owner would be subject to tax upon acquisition had the stock or debt obligations been acquired directly by him.

2 U.S.Code Cong. & Admin.News, *supra*, at p. 3493. An illustration in the House Report further indicates that, if the foreign corporation serves as a holding company, regardless of whether it was formed for that purpose or whether its securities trading is continuing, then acquisition of its stock cannot be exempt from the Interest Equalization Tax:

> [I]f A, a United States person, acquires 10 percent of the stock of M, a foreign corporation engaged primarily in the business of investing, reinvesting, or trading in foreign securities the direct acquisition of which by A would be subject to the interest equalization tax, the acquistion is not excluded under Section 4915.

H.R.Rep. No. 1046, *supra*, 52–53 (1964— 2 Cum.Bull. at 744). If we were to accept the taxpayers' construction of the exception, the purpose of the tax would be defeated by American investments in holding companies which had no continuing or prospective securities trading activity after the taxpayers' acquisition of its shares. From our reading of Section 4915(c), we conclude that the provisions are not directed only to continuing or prospective trading.

Moreover, the Section 4915(c) exception is transactional, in that, while the general use of a foreign corporation may not be for the purpose of avoiding this tax, any specific use of such corporation for any transaction the result of which is avoidance of the Interest Equalization Tax will result in the elimination of the exclusion for direct investments with respect to that particular transaction. *See* 117–2nd Tax Mgmt. Portfolio A–23 (1971). Whatever intent the Garretts might allege regarding their purchases, the acquisitions of Western equity by the purchase of Westsales stock was, in effect, a means of avoiding the tax, if the taxpayers' argument were to be accepted. Thus, in ordinary parlance, the Garretts made use of or "availed of" Westsales. This is sufficient to render the Section 4915(a)(1) direct investment exemption inapplicable.

We do not reach the Government's argument that the direct investment exemption applies only when the taxpayer is actively engaged in the management of the foreign corporation, beyond the activity of voting stock. Having sustained the Government's position on the exception to the exemption, it is unnecessary to consider this point.

Affirmed.